Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL VII

| | | |
|---|---|---|
| **JESÚS MANUEL DEL VALLE PADILLA Y OTROS**<br><br>Apelante<br><br>v.<br><br>**CARIBBEAN ADJUSTERS INTERNATIONAL, LLC Y OTROS**<br><br>Apelada | KLAN202400993 | ***APELACIÓN***<br>procedente del Tribunal de Primera Instancia Sala Superior de **Bayamón**<br><br>Caso Número:<br>BY2018CV169<br>(Salón 402)<br><br>Sobre:<br>**COBRO DE DINERO (ordinario)** |

Panel integrado por su presidenta, la Juez Domínguez Irizarry, el Juez Ronda del Toro y el Juez Pérez Ocasio

Pérez Ocasio, Juez Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 13 de mayo de 2025.

Comparece ante nos, Jesús M. del Valle Padilla, en adelante, Del Valle Padilla o apelante, solicitando que revisemos la *"Sentencia"* notificada el 22 de agosto de 2024 por el Tribunal de Primera Instancia, Sala Superior de Bayamón, en adelante, TPI-Bayamón. En la misma, el Foro Apelado concedió una cuantía a Del Valle Padilla en concepto de cobro de dinero.

Por los fundamentos que expondremos a continuación, *revocamos en parte* el dictamen apelado.

**I.**

El apelante es abogado licenciado de profesión, y mediante el ofrecimiento de servicios legales, realizó las gestiones para incorporar a Caribbean Adjusters International, LLC, en adelante CAI o apelada, ante el Departamento de Estado.[1] CAI es una

---
[1] Apéndice del recurso, pág. 762.

Número Identificador
SEN2025 _____

compañía de ajustadores públicos.[2] El presidente de la referida Corporación es Luis Esteves Selosse, en adelante, Esteves Selosse.[3] Su padre, Luis Esteves Venegas, en adelante, Esteves Venegas, es un ajustador público que labora para CAI, haciendo ajustes en reclamaciones.[4]

Esta Corporación le pagaba en comisiones un veinte por ciento (20%) a sus vendedores, un veinte por ciento (20%) a sus ajustadores y un diez por ciento (10%) a sus estimadores.[5] Los vendedores recibían su comisión cuando conseguían un cliente para CAI. Sin embargo, si el cliente llegaba al vendedor por medio del referido de un tercero, su comisión era de un diez por ciento (10%), ya que se dividía entre este y el tercero.[6]

Ahora bien, Del Valle Padilla ofrecía servicios legales a CAI,[7] y *recibía comisión por los clientes que le refería en concepto de vendedor.*[8] Posterior al paso del Huracán María, el apelante alcanzó varios clientes, de manera directa, para CAI. Entre estos están Concordia Courts Apartments;[9] Colegio Nuestra Señora del Pilar;[10] Dores Development Corp.;[11] Park View Realty, Inc.;[12] Candina Sea Tower Building;[13] y Nouvelle D'Spa.[14]

Surge de los documentos en el expediente, que los clientes Union Holdings, Inc. & Union de Inversiones, Inc.;[15] Action Cargo Transport, Inc.;[16] Condominio Lago Mar;[17] Lagoon Villas;[18]

---

[2] Apéndice del recurso, pág. 106.
[3] *Id.*, pág. 930.
[4] *Id.*, pág. 1236.
[5] *Id.*, pág. 807.
[6] *Id.*
[7] *Id.*, pág. 808.
[8] *Id.*, págs. 807-808.
[9] *Id.*, pág. 7.
[10] *Id.*, pág. 809.
[11] *Id.*, pág. 810.
[12] *Id.*
[13] *Id.*, pág. 8.
[14] *Id.*, pág. 12.
[15] *Id.*, págs. 9-10.
[16] *Id.*, pág. 11.
[17] *Id.*, págs. 924-925.
[18] *Id.*

Caribbean Towers;[19] Pasarella del Condado;[20] y Carrión Court Playa[21] fueron clientes de Del Valle Padilla mediante tercero. El referido aludido surgió del corredor de seguros, Antonio Villaverde Cuebas, en adelante, Villaverde Cuebas, ya que estos eran sus clientes.[22]

Mientras ofrecía estos servicios al CAI, el Licenciado Mario Prieto Batista, en adelante, Prieto Batista, se comunicó con el apelante. El mencionado letrado es un conocido allegado a Del Valle, que al momento del Huracán María, laboraba como Director de la Dirección Legal del Sistema de Salud Menonita, en adelante, Menonita.[23] Prieto Batista inquirió al apelante sobre servicios de ajustadores, para la pronta reclamación que el Menonita haría a su aseguradora, a consecuencia de los estragos del Huracán María.[24] Del Valle Padilla le orientó sobre los servicios del CAI,[25] quien posteriormente fue contratado por Menonita para trabajar el ajuste de la reclamación al seguro.[26]

Por ser Menonita una entidad sin fines de lucro, el contrato de ajuste tenía dos (2) vertientes – la relevante a los daños a la propiedad y aquella que la Agencia Federal para el Manejo de Emergencias (FEMA, por sus siglas en inglés) sufragaría. Aunque el contrato originalmente se pactó con la corporación Adjusters International, fue enmendado posteriormente para autorizar a CAI a realizar el trabajo, y a que Menonita les pagara a estos.[27]

Sin embargo, aproximadamente para la primavera del año 2018, CAI terminó su relación laboral con Del Valle Padilla.[28] Más tarde, el 27 de agosto de 2018, el apelante incoó una *"Demanda"* en

---

[19] Apéndice del recurso, págs. 924-925.
[20] *Id.*
[21] *Id.*
[22] *Id.*, pág. 762.
[23] *Id.*, pág. 1030.
[24] *Id.*, pág. 1036.
[25] *Id.*, pág. 1037.
[26] *Id.*, pág. 878.
[27] Transcripción de la prueba oral, pág. 1087.
[28] *Id.*, págs. 1114-1115 y 1258.

cobro de dinero contra CAI ante el TPI-Bayamón.[29] La misma fue enmendada el 9 de enero de 2019.[30] El apelante solicitó las comisiones de los clientes Concordia Courts Apartments, Candina Sea Tower, Union Holdings, Inc. & Union de Inversiones, Inc., Action Cargo Transport, Inc. Nouvelle D' Spa,  Dores Development Corp., Colegio Nuestra Señora del Pilar, *Menonita*, Parkville Realty, Inc., Condominio Lago Mar, Lagoon Villas, Caribbean Towers y Pasarella del Condado para un total de $560,436.75, sujeto a los ajustes que en aquel momento aún no se habían realizado para múltiples clientes. Por otro lado, Del Valle Padilla arguyó que era socio de CAI, por lo que le correspondía la cantidad de $6,000,000.00 por las ganancias netas de la compañía.[31] Finalmente, solicitó al Foro Primario la imposición de costas, gastos, intereses y honorarios de abogado.

Por su parte, CAI presentó su *"Contestación a Demanda Enmendada"* el 7 de febrero de 2019.[32] La apelada solicitó que se desestimara la demanda en su totalidad, negando tener un contrato con Del Valle Padilla.

Luego de varios años tramitándose la *"Demanda Enmendada"*, CAI presentó una *"Moción Solicitando Sentencia Sumaria"*, el 14 de junio de 2022.[33] Mediante *"Resolución"* del 26 de septiembre de 2022, el TPI-Bayamón declaró la misma *"No Ha Lugar"*.[34] Sin embargo, destacamos las siguientes determinaciones de hechos incontrovertidos adoptados por el Foro Primario en el referido dictamen:[35]

> 2. CAI le paga un 20% a los vendedores, 20% a los ajustadores y un 10% a los estimadores.

---

[29] Transcripción de la prueba oral, pág. 1.
[30] *Id.*, pág. 15.
[31] Apéndice del recurso, pág. 24.
[32] *Id.*, pág. 25.
[33] *Id.*, pág. 38.
[34] *Id.*, pág. 759.
[35] Destacamos que ambas partes adoptaron estos hechos incontrovertidos en su "Moción Conjunta en Cumplimiento de Orden" del 21 de agosto de 2023. (Apéndice del recurso, pág. 807). (Énfasis suplido).

3. El licenciado Del Valle *era considerado como vendedor.*

4. "Referidos", según CAI, es que si algún cliente llega a CAI por un referido de una tercera persona, dependiendo de quién es la persona, se le considera una comisión y que el señor Emilio Villaverde es un ejemplo de "un referido o un tercero".

5. Si un vendedor recibe un referido de un cliente, él como vendedor recibe un 20%, pero divide su participación con la persona que le refirió.

6. Cuando se hace un acuerdo de que hay un referido existente de alguien, el vendedor así lo expresa a CAI y cuando CAI paga la comisión, se le hace un pago individual a cada uno, según ese acuerdo.

Luego de esa determinación interlocutoria, los procesos en el Foro Apelado siguieron su curso natural. El 16 de mayo de 2023, las partes radicaron el *"Informe sobre Conferencia Preliminar entre Abogados Enmendado en Cumplimiento de Orden".*[36] Poco después, el 12 de junio de 2023, se celebró la Conferencia con Antelación a Juicio.[37] En el mismo, el Foro Primario ordenó a las partes a presentar una moción conjunta en los próximos veinte (20) días con las estipulaciones que faltaron en el Informe precitado. En cumplimiento de orden, el 21 de agosto de 2023, CAI y Del Valle Padilla radicaron la referida moción, en la que *estipularon* los siguientes hechos:

1. La cantidad neta recibida por CAI por el ajuste de Concordia Courts Apartment, fue de $27,608.85 dólares, cliente que fue referido a CAI por el Lcdo. Del Valle. La comisión correspondiente por este referido lo es de $5,521.77 (20% del Neto).

2. La cantidad neta recibida por CAI por el ajuste del Colegio Nuestra Señora del Pilar, fue de $59,454.81 dólares, cliente que fue referido a CAI por el Lcdo. Del Valle. Luego de haber pagado CAI la comisión al "tercer referido", a saber, el Lcdo. Mario Prieto, la comisión correspondiente por este referido, es de $5,945.48 (10% del Neto).

3. La cantidad neta recibida por CAI por el ajuste de Action Cargo Transport, Inc., and/or Action Properties and/or

---

[36] Apéndice del recurso, pág. 772.
[37] *Id.*, pág. 802.

Action Holding, LLC., cuyo "tercer referido" es el Sr. Emilio Villaverde, el neto recibido por CAI es de $61,068.80 dólares. La comisión correspondiente por este referido lo es $6,106.81 dólares (10% del Neto).

4. La cantidad neta recibida por CAI por el ajuste de Nouvelle D'Spa, fue de $56,552.24, cliente referido por el Lcdo. Del Valle. La comisión correspondiente por este referido es $11,310.45 dólares, (20% del Neto).

5. En el caso de Dores Development Corp., cliente referido por el Lcdo. Del Valle, CAI no ha recibido pago alguno por su factura que totaliza $12,646.05. Si Dores Development Corp. paga su factura a CAI, entonces la comisión correspondiente por éste referido sería $2,402.75 dólares (20% del Neto).

6. La cantidad neta facturada por CAI por el ajuste de Park View Realty, Inc., fue de $31,802.58 dólares. Si Park View Realty, Inc., cliente referido por el Lcdo. Del Valle, Si el cliente paga su factura a CAI, entonces la comisión correspondiente por éste referido sería $6,042.49 dólares (20% del Neto).

7. La cantidad neta recibida por CAI por el ajuste de Association Co-owners of Condominium Caribbean Towers, cuyo "tercer referido" fue el Sr. Emilio Villaverde, fue de $11, 704.98 dólares. Si el Lcdo. Del Valle demuestra que él refirió este cliente, la comisión correspondiente por este referido es $1,170.50 dólares (10% del Neto).

8. La cantidad neta recibida por CAI por el ajuste de Condominio Pasarella del Condado, cuyo "tercer referido" es el Sr. Emilio Villaverde, fue de $9,523.79 dólares. Si el Lcdo. Del Valle demuestra que él refirió esta reclamación a CAI la comisión correspondiente por este referido es $952.37 dólares. (10% del Neto).

(Énfasis omitido).

Así las cosas, el juicio en su fondo fue celebrado los días 5 y 6 de marzo de 2024.[38] Como parte de la prueba del apelante, testificaron Villaverde Cuevas, Prieto Batista y el propio Del Valle Padilla.[39] Por la parte demandada, testificó Esteves Venegas y

---

[38] Apéndice del recurso, págs. 897 y 917.
[39] *Id.*, págs. 200-255; 957-1212.

Esteves Selosse, entre otros.[40] Sin trámites ulteriores, el caso quedó sometido.

El 22 de agosto de 2024, el TPI-Bayamón notificó su *"Sentencia"*.[41] En su dictamen, el Foro Apelado no le concedió al apelante la ganancia neta de CAI, por no considerarlo socio de la corporación. Sin embargo, ordenó a CAI a pagarle a Del Valle Padilla la cantidad de $123,701.44 en concepto de comisión, por los clientes Concordia Courts Apartments, Candina Sea Tower, Union Holdings, Inc. & Union de Inversiones, Inc., Action Cargo Transport, Inc., Nouvelle D' Spa, Colegio Nuestra Señora del Pilar, Lagoon Villas, Caribbean Towers y Pasarella del Condado.[42] Con respecto a Dores Development Corp. y Parkville View Realty, las comisiones quedaban sujetas al pago de estas a favor de CAI. Sin embargo, el TPI-Bayamón no incluyó en su dictamen la reclamación por concepto de comisión por *Menonita.*

El 5 de septiembre de 2024, Del Valle Padilla presentó una moción solicitando reconsideración y determinaciones de hechos adicionales.[43] CAI presentó oportunamente su oposición a la misma, el 4 de octubre de 2024.[44] Finalmente, el 7 de octubre de 2024, el TPI-Bayamón notificó *"Resolución"*, en la que declaró la solicitud del apelante *"No Ha Lugar"*.[45]

Inconforme, el 6 de noviembre de 2024, Del Valle Padilla presentó ante esta Curia una *"Apelación Civil"*. En su petitorio, el apelante hizo los siguientes señalamientos de error:

> PRIMER ERROR: **Erró el TPI al no incluir al cliente "Sistema de Salud Menonita" como parte del listado de clientes referidos por el Lcdo. Del Valle Padilla a CAI, cuando el referido de "Menonita" está fundamentado por la evidencia presentada estipulada y admitida en el juicio.**

---

[40] Apéndice del recurso, pág. 1236.
[41] *Id.*, pág. 922.
[42] *Id.*, pág. 943.
[43] *Id.*, pág. 945.
[44] *Id.*, pág. 1353.
[45] *Id.*, pág. 1366.

SEGUNDO ERROR: **Erró el TPI al no imponer intereses pre sentencia en un cobro de dinero, a pesar de que el deudor CAI negó en el 2018 al presentarse la demanda partidas por concepto de deudas que luego estipuló y otras que fueron adjudicadas por el Tribunal.**

TERCER ERROR: **Erró el TPI al no imponer el pago de honorarios de abogado cuando el expediente judicial es concluyente en cuanto a la temeridad del deudor.**

Ese mismo día, el apelante también radicó ante nos una moción, solicitando autorización para presentar la prueba oral del juicio, la cual obraba en el apéndice del recurso. Mediante *"Resolución"* del 8 de noviembre de 2024, autorizamos la prueba oral, y le concedimos hasta el 9 de diciembre de 2024 a la apelada para presentar su posición en cuanto a la apelación.

El 9 de diciembre de 2024, CAI compareció mediante *"Alegato de la Parte Apelada en Oposición a la Apelación"*. Con el beneficio de la comparecencia de ambas partes y la prueba oral transcrita, queda perfeccionado el recurso apelativo ante nuestra consideración, por lo que procedemos a expresarnos.

**II.**

**A. Apelación Civil**

Las Reglas de Procedimiento Civil de Puerto Rico se desenvuelven en un orden lógico, natural y armonioso entre sí. Este orden queda demostrado en las distintas etapas de un litigio, entiéndase las alegaciones, mociones, descubrimiento, vista evidenciaria, sentencia, reconsideración, *apelación,* y sus efectos escalonados. Cada etapa se sirve de la anterior y se proyecta, entonces, para la próxima. *Vega v. Alicea,* 145 DPR 236, 238 (1998).

La etapa de la *apelación* se perfecciona con la presentación oportuna de un escrito conforme a las formalidades establecidas en nuestro estado de derecho, que incluye su debida notificación a las

partes. El recurso de apelación es aquel que se presenta ante un foro de mayor jerarquía cuando se solicita la revisión de una sentencia, o un dictamen final, emitido por el Foro de Primera Instancia. Regla 52.1 y 52.2 de Procedimiento Civil, 32 LPRA, Ap. VIII, R. 52; *Freire Ruiz de Val v. Morales Román*, 2024 TSPR 129, 214 DPR ___ (2024); *González Pagán v. SLG Moret-Brunet*, 202 DPR 1062, 1070-1071 (2019). Véase R. Hernández Colón, *Práctica Jurídica de Puerto Rico: Derecho Procesal Civil*, 6ta Ed., San Juan, Ed. Lexis Nexis, 2017, pág. 519.

La *apelación* no es un recurso discrecional como en los casos de *certiorari*. Una vez se cumpla con los requisitos jurisdiccionales y de perfeccionamiento del recurso, el Tribunal de Apelaciones viene obligado a atender el asunto y resolverlo en sus méritos, de forma fundamentada. *Soc. de Gananciales v. García Robles*, 142 DPR 241, 252 (1997). En ese sentido, se reconoce que existe el derecho estatutario para acudir en apelación ante el Tribunal de Apelaciones, cuestionando toda sentencia final emitida por el Tribunal de Primera Instancia. *Freire Ruiz de Val v. Morales Román*, supra; *Silva Barreto v. Tejada Martell*, 199 DPR 311, 317 (2017). Regla 13(A) del Reglamento del Tribunal de Apelaciones 4 LPRA Ap. XXII-B, R. 13(A); Art. 4.006(a) Ley de la Judicatura del Estado Libre Asociado de Puerto Rico de 2003, Ley Núm. 201-2003, 4 LPRA sec. 24y.

Al revisar una determinación de un foro de menor jerarquía, los tribunales revisores tenemos la tarea principal de auscultar si se aplicó correctamente el derecho a los hechos particulares del caso. Como regla general, los foros apelativos no tenemos facultad para sustituir las determinaciones de hechos del tribunal de instancia con nuestras propias apreciaciones. *W.M.M. P.F.M., et al. v. Colegio et al.*, 211 DPR 871, 902-903 (2023); *Dávila Nieves v. Meléndez*

*Marín*, 187 DPR 750, 770-771 (2013); *Serrano Muñoz v. Auxilio Mutuo*, 171 DPR 717, 741 (2007). De manera que, si la actuación del tribunal no está desprovista de base razonable, ni perjudica los derechos sustanciales de una parte, debe prevalecer el criterio del juez de instancia a quien corresponde la dirección del proceso. *Bathia Gautier v. Gobernador*, 199 DPR 59, 182 (2017); *Sierra v. Tribunal Superior*, 81 DPR 554, 572 (1959).

### B. Apreciación de la prueba

La Regla 42.2 de Procedimiento Civil, 32 LPRA Ap. V, R. 42.2, dispone en cuanto a las determinaciones de hechos basadas en testimonio oral que "no se dejarán sin efecto a menos que sean claramente erróneas, y se dará la debida consideración a la oportunidad que tuvo el tribunal sentenciador para juzgar la credibilidad de las personas testigos". Cónsono con la antedicha disposición reglamentaria, ha sido norma reiterada que "[e]n ausencia de error, prejuicio o parcialidad, los tribunales apelativos no intervendr[emos] con las determinaciones de hechos, con la apreciación de la prueba ni con la adjudicación de credibilidad que efectúe el Tribunal de Primera Instancia". *Ramírez Ferrer v. Conagra Foods PR*, 175 DPR 799, 811 (2009). Véase, además, *Barreto Nieves et al. v. East Coast*, 213 DPR 852, 889 (2024); *SLG Rivera-Pérez v. SLG Díaz-Doe et al.*, 207 DPR 636, 657 (2021). *Torres Vélez v. Soto Hernández*, 189 DPR 972, 990 (2013). Entretanto, precisa recordar que las decisiones judiciales están revestidas de una presunción de corrección. *Vargas v. González*, 149 DPR 859, 866 (1999).

Ahora bien, lo anterior no implica que las determinaciones del foro a *quo* no sean revisables o inmutables. Aunque respetables las determinaciones del juzgador de hechos, estas "no tienen credenciales de inmunidad frente a la función revisora de este Tribunal". *Vda. de Morales v. De Jesús Toro*, 107 DPR 826, 829

(1978). La intervención de un foro apelativo con la evaluación de la prueba testifical procederá "en casos en los que luego de un análisis integral de la prueba, nos cause una insatisfacción o intranquilidad de conciencia tal que estremezca nuestro sentido básico de justicia". *Sunc. Rosado v. Acevedo Marrero,* 196 DPR 884, 918 (2016). Véase, además, *Rivera Menéndez v. Action Service,* 185 DPR 431, 444 (2012).

Igualmente podemos dejar sin efecto las determinaciones de hechos realizadas por el foro de primera instancia, siempre que "del examen de la totalidad de la evidencia [quedemos] definitiva y firmemente convencido[s] que un error ha sido cometido, como es el caso en que las conclusiones de hecho[s] están en conflicto con el balance más racional, justiciero y jurídico de la totalidad de la evidencia recibida". *Maryland Casualty Co. v. Quick Const. Corp.,* 90 DPR 329, 336 (1964). Recientemente, nuestro más Alto Foro expresó que "el error manifiesto ocurre cuando el foro apelativo queda convencido de que se cometió un error, a pesar de que haya evidencia que sostenga las conclusiones de hecho del tribunal, porque existe un conflicto entre las conclusiones y el balance más racional, justiciero y jurídico de la totalidad de la evidencia recibida". *Ortiz Ortiz v. Medtronic,* 209 DPR 759, 779 (2022).

Como parte de la naturaleza inherente de este foro apelativo intermedio, no celebramos juicios plenarios, ni presenciamos el testimonio oral de los testigos, ni dirimimos credibilidad, sino que contamos, de ordinario, con "récords mudos e inexpresivos". *SLG Rivera Carrasquillo v. A.A.A.,* 177 DPR 345, 356 (2009). Aunque este Tribunal no tiene la facultad de evaluar el lenguaje corporal, expresiones o demás elementos subjetivos, sí nos encontramos en la misma posición del foro primario para evaluar la prueba documental o pericial que fundamentan las determinaciones de hecho. *Sucn. Rosado v. Acevedo Marrero,* supra, pág. 918; *González*

*Hernández v. González Hernández*, 181 DPR 746, 777 (2011). Para que proceda la revocación de un dictamen realizado por el foro primario, la parte "apelante tiene que señalar y demostrar la base para ello". Quien "cuestione una determinación de hechos realizada por el foro primario debe señalar el error manifiesto o fundamentar la existencia de pasión, perjuicio o parcialidad". *SLG Rivera Carrasquillo v. A.A.A.*, supra, pág. 356.

### C. Temeridad: Honorarios e Intereses Pre-Sentencia

La conducta que amerita la imposición de honorarios de abogado por temeridad es cualquiera que haga necesario un pleito que se pudo evitar o que ocasione gestiones evitables. El propósito de la imposición de honorarios de abogado en casos de temeridad es establecer una penalidad a un litigante perdidoso que, por su terquedad, obstinación, contumacia e insistencia en una actitud desprovista de fundamentos, obliga a la otra parte a innecesariamente asumir las molestias, gastos, trabajos e inconvenientes de un pleito. *SLG González-Figueroa v. SLG et al.*, 209 DPR 138, 150 (2022); *Andamios de P.R. v. Newport Bonding*, 179 DPR 503, 546 (2010); *Blas v. Hosp. Guadalupe*, 146 DPR 267, 334-335 (1998); *Fernández v. San Juan Cement Co., Inc.*, 118 DPR 713, 718 (1987).

Al respecto, la Regla 44.1 (d) de Procedimiento Civil, 32 LPRA Ap. V, R. 44.1 (d), dispone como sigue:

> [...]
> (d) Honorarios de Abogado - En caso de que cualquier parte o su abogado o abogada haya procedido con temeridad o frivolidad, el tribunal deberá imponerle en su sentencia al responsable el pago de una suma por concepto de honorarios de abogado que el tribunal entienda correspondan a tal conducta. En caso de que el Estado Libre Asociado de Puerto Rico, sus municipios, agencias o instrumentalidades haya procedido con temeridad o frivolidad, el tribunal deberá imponerle en su sentencia una suma por concepto de honorarios de abogado, excepto en los casos en que esté

expresamente exento por ley del pago de honorarios de abogado.

*SLG González-Figueroa v. SLG et al.*, supra, pág. 145.

Por su parte, la Regla 44.3 de Procedimiento Civil, supra, establece dos tipos de intereses legales, a saber, el interés pre-sentencia y el post-sentencia. El propósito de esta Regla es promover que el deudor de una sentencia se ajuste con prontitud a los términos de ésta y compense expeditamente al acreedor de esta. El interés pre-sentencia al que se refiere el inciso (b) del referido Artículo, procede sobre la cuantía de la sentencia, excluyendo así las costas y honorarios de abogado. *González Ramos v. Pacheco Romero,* supra, pág. 146. Además, únicamente se impone si la parte perdidosa actuó con temeridad en la tramitación del pleito y si se trata de una demanda de cobro de dinero o por daños y perjuicios. *Id.* En los casos de cobro de dinero, el interés pre-sentencia se computa desde que surge la causa de acción. *Montañez v. U.P.R.,* 156 DPR 395, 424-425 (2002).

Aunque la penalidad por temeridad de una parte no está explícitamente consignada en las Reglas de Procedimiento Civil, supra, es a través de la imposición de honorarios de abogado, que el Tribunal ejerce esta facultad. Así, el juzgador tendrá que adjudicar el monto correspondiente al grado de temeridad desplegado por el actor, ello mediante el ejercicio de su sano juicio. Por tanto, la determinación que en su día emita, ***solo será objeto de revisión si ha mediado abuso de discreción en el ejercicio de su ministerio***. *Consejo de Titulares Cond. Playa Azul v. MAPFRE,* 2024 TSPR 140, 215 DPR ___ (2024); *Colón Santos v. Coop. Seg. Múlt. P.R.,* 173 DPR 170, 188 (2008); *Blás v. Hosp. La Guadalupe,* supra, pág. 334; *Fernández v. San Juan Cement Co.,* supra, pág. 722. En dicho contexto, la doctrina vigente reconoce que un tribunal incurre *"en abuso de discreción cuando el juez: ignora sin fundamento algún*

*hecho material; cuando [el juez] le concede demasiado peso a un hecho inmaterial y funda su decisión principalmente en ese hecho irrelevante, o cuando éste, a pesar de examinar todos los hechos del caso, hace un análisis liviano y la determinación resulta irrazonable".* Citibank et al. v. ACBI et al., 200 DPR 724, 736 (2018).

Es por ello que, "la determinación de si se ha incurrido o no en temeridad es una tarea que recae en la discreción sana del tribunal sentenciador y ***solo se intervendrá con ella en casos en los que se desprenda el abuso de tal facultad***". *Consejo de Titulares Cond. Playa Azul v. MAPFRE,* supra; *SLG González-Figueroa v. SLG et al.,* supra, pág. 150 (2022); *Maderas Tratadas v. Sun Alliance et al.,* 185 DPR 880, 926 (2012); *SLG Flores–Jiménez v. Colberg,* 173 DPR 843, 866 (2008). (Énfasis nuestro).

### III.

Del Valle Padilla recurre ante nos haciendo tres (3) señalamientos de error. En el *primero* de estos, arguye que el TPI-Bayamón se equivocó al no reconocer a Menonita como uno de sus referidos a CAI. Expone el apelante que, de la prueba estipulada, y la prueba oral, surge este hecho. Por todo lo cual, peticiona ante esta Curia el pago de la comisión de Menonita. *Le asiste la razón.*

Es un hecho incontrovertible y estipulado por las partes que el apelante, para los efectos de las comisiones, *era un vendedor de CAI.* Sin embargo, no obra en el expediente contrato o prueba sobre cuáles eran los deberes y facultades de los vendedores, y qué constituía específicamente un referido – directo o por tercero – de un vendedor. Como la controversia aquí planteada requiere la contestación a estas interrogantes para determinar si Menonita es un cliente de CAI, referido por Del Valle Padilla, justipreciamos que el Foro Apelado debió descansar en la prueba oral para adjudicar.

Si bien es cierto que las apreciaciones del Foro Primario merecen deferencia, por ser este el foro que observa, escucha y aquilata la prueba, el mismo no es infalible. Este Tribunal tiene la facultad de intervenir cuando, de un estudio minucioso del expediente y la prueba oral transcrita surja que el Foro Primario erró o abusó de su discreción. Por entender que, junto a la evidencia documental, *la prueba oral establece que Menonita fue un referido del apelante, en calidad de vendedor de CAI*, entendemos que el TPI-Bayamón se equivocó en su apreciación de la controversia con respecto al cliente en cuestión. Veamos.

En el primer día de juicio, testificó Esteves Venegas, ajustador y vendedor de CAI. Durante el examen directo, se le increpó a este sobre las funciones de los vendedores de CAI, a lo que respondió lo siguiente: "*su función era conseguir al cliente, no trabajarlo*".[46] Añadió, además, que "[u]n vendedor consigue clientes y los trae para que se les haga una presentación de un contrato. Una vez eso pasa, ya ese vendedor, por norma general —a menos que se le pida una información específica del cliente— ya no vuelve a intervenir en el caso. Quizás en algunas cosas, en algunas consultorías, pero es muy poco. De ahí en adelante, quien los trabaja son los empleados del CAI, cada uno en su función independiente".[47]

Así, resulta forzoso concluir que la responsabilidad de un vendedor de la apelada es exclusivamente conseguir clientes que contraten los servicios de CAI. Colegimos que un vendedor cumple con sus funciones para el CAI si: 1) orienta a un cliente sobre los servicios de CAI y 2) los refiere a CAI. La compañía no espera trabajos ulteriores de sus vendedores.

Por otro lado, los hechos incontrovertidos y *estipulados entre las partes* disponen que CAI le paga un veinte por ciento (20%) en

---

[46] Transcripción de la prueba oral, pág. 1176. (Énfasis suplido).
[47] *Id.*, 1177.

comisiones a sus vendedores. Sin embargo, si un cliente llega a un vendedor referido por un tercero, dependiendo de quién es la persona, esta comisión se divide entre el tercero y el vendedor.

Ahora bien, la pregunta que este Tribunal naturalmente se hace ante este cuadro es ¿qué identifica un referido directo o por tercero? En el expediente hemos observado varios acuerdos entre CAI y sus clientes. En algunos consta la comparecencia de Del Valle Padilla, y en otros no, como en el de Menonita. No obra en autos documento o contrato alguno que estipule los contornos de los referidos a CAI. Por ello, nos referimos a la prueba oral.

Durante el directo de Esteves Venegas y el contrainterrogatorio, surgió este asunto sobre la firma de Del Valle Padilla y si este lo acompañaba a visitar los clientes y firmaba en los contratos. Este admitió que en ocasiones iban juntos, pero no a todos. Además, sugirió que las firmas del apelante en los contratos habían sido impresas posterior a su propia firma. Sin embargo, no pudo establecer sobre qué línea temporal se basaba para no reconocer las firmas del apelante que aparecían próximas a las suyas.

No obstante a todo lo anterior, durante el contrainterrogatorio, Esteves Venegas se vio forzado a reconocer que las firmas en los contratos **no** establecen a través de qué vendedor llega un cliente a CAI:[48]

> P: Sí. Pero aunque usted sea el ajustador, eso no quiere decir que usted fue quien llevó ese contrato a CAI, ¿correcto? Porque solamente está firmando como ajustador, ¿correcto?
> R: Eso es correcto.
> P: Okey. Y entonces, le muestro el de Union Holdings, que es el Exhibit 8, que fue con el que lo confrontaron, y usted vuelve a firmar como ajustador, ¿correcto?
> R: En firma de ajustador. Sí, señor, representando...
> P: ¿Correcto?

---

[48] Transcripción de la prueba oral, págs. 1187-1190.

R: ...representando a CAI. Sí.

P: Como ajustador, ¿correcto?

R: A CAI.

P: ¿Eso es lo que dice ahí?

R: Sí, en representación de CAI.

P: No, no. Aquí dice "*Name of Adjuster*". No dice más nada, ¿correcto?

R: Eso es correcto, sí.

P: No dice en ningún lado "Representando a nadie", ¿correcto?

R: Eso es así.

P: Okey. Y el que usted tuviera esto como ajustador, no quiere decir que usted fue quien llevó el cliente a CAI, ¿correcto?

R: No necesariamente.

P: Del documento, búsqueme dónde surge que usted fue el que lo llevó a CAI.

[...]

R: No le entiendo su pregunta.

P: Del documento búsqueme de dónde surge que usted fue el que lo llevó a CAI.

R: Su Señoría, no, no le entiendo la pregunta.

HONORABLE JUEZ:

Que si del documento, que usted lo puede mirar, surge que usted fue quien llevó ese cliente a Caribbean Adjusters.

TESTIGO, SR. LUIS R. ESTEVES VENEGAS:

Era la norma.

P: Esa no es la pregunta. La pregunta es la parte del documento, porque usted firma como ajustador. Del documento, ¿dónde surge lo que usted está diciendo, que usted lo llevó a CAI?

R: [No se escucha respuesta verbal].

P: ¿Verdad que no surge?

R: Es que yo no puedo decir que yo...

P: Óigame, ¿verdad que no surge?

R: No surge, no.

En el segundo día de juicio, testificó Esteves Selosse, presidente de CAI.[49] A este también se le increpó sobre las firmas de Del Valle Padilla en los contratos de la corporación con sus respectivos clientes. Este, de igual manera, arguyó que el apelante

---

[49] Transcripción de la prueba oral, pág. 1236.

había firmado en los contratos posterior a Esteves Venegas. Sin embargo, tampoco pudo justificar su alegación. De hecho, tuvo que admitir que no había manera de establecer quien había firmado primero en los contratos:[50]

> P: Y de ese documento usted no puede establecer quién firmó primero. Usted no puede establecer quién firmó primero, si Esteves o Del Valle, ¿correcto?
> R: Del documento original yo sé que firmó mi padre primero.
> P: De ese documento que está ahí, ¿se puede establecer quién firmó primero?
> R: No.

La representación legal del apelante planteó en su contrainterrogatorio que los contratos que desfilaban en juicio eran *documentación estipulada* por las partes. Increpó, por lo tanto, a Esteves Selosse sobre su postura con relación a las firmas de Del Valle Padilla.[51] Específicamente, le preguntó si este había objetado oportunamente la firma de Del Valle Padilla en los contratos que aparecía, y que había estipulado:[52]

> P: Okey, gracias. Exhibit 11. Exhibit 11. Ese documento que le estoy mostrando no surge cuándo se fir... quién firma primero, si Esteves Venegas o Jesús Del Valle, ¿correcto?
> R: La misma contestación; quien firma en la línea como Adjusters es quien firma el documento.
> P: Y la misma pregunta, ¿quién firmó primero? Que fue la pregunta, ¿cuál es la respuesta? Usted no lo sabe, ¿verdad?
> R: Yo veo por el documento que quien firmó primero fue mi padre.
> P: ¿Usted vio cuando se firmó?
> R: No lo vi.
> P: ¿Usted objetó que estuviera la firma Del Valle en ese documento?
> R: No objeté que estuviese la firma en el documento.

Concluimos, que no existe un acuerdo o contrato entre las partes que establezca una formalidad al proceso de referidos de los

---

[50] Transcripción de la prueba oral, págs. 1289-1290.
[51] *Id.*, págs. 1291-1294.
[52] *Id.*, págs. 1293-1294.

vendedores. En ausencia de prueba en contrario, sostenemos que el apelante laboraba como vendedor de CAI, cuando ofrecía orientaciones sobre los servicios de la corporación y los refería a esta como clientes potenciales. Es un hecho estipulado por la parte apelada que el apelante refirió varios clientes a CAI, así como la deuda de estos últimos con Del Valle Padilla por los clientes establecidos en la Moción del 21 de agosto de 2023. Sin embargo, resta por determinar si Menonita es un cliente de CAI, referido por Del Valle Padilla. Veamos.

El apelante sostiene que Menonita contrató los servicios de CAI, mediante su referido, y como consecuencia de su orientación a estos. Por su parte, Esteves Selosse declaró en el segundo día de juicio que el contacto de CAI con Menonita comenzó después del Huracán Irma, luego de que la apelada les enviara correos electrónicos a estos.[53] Sin embargo, cuando este asunto es traído en el contrainterrogatorio, la representación legal del apelante increpó a Esteves Selosse si podía evidenciar que CAI contactó a Menonita, sin la intervención de Del Valle Padilla. Considerando que su testimonio en el directo hizo referencia a prueba de fácil corroboración, como correos electrónicos, hemos evaluado con gran escrutinio el siguiente intercambio:

> P: Okey. ¿Y usted dice que eso no es cierto?
> R: Correcto.
> P: Pero no tiene cómo establecerlo, ¿correcto?
> R: Yo tengo suficiente prueba de cómo establecerlo, que mi abogado todavía no lo haya presentado...
> P: ¡Ah! Okey. Aquí no ha desfilado... Le pregunto, de lo que usted ha oído hasta ahora, ¿ha desfilado prueba que establezca su alegación de que fue CAI quien llegó a Menonita sin la intervención de Del Valle?
> LCDA. SHEILA TORRES DELGADO:
> Objeción.
> HONORABLE JUEZ:

---

[53] Transcripción de la prueba oral, pág. 1254.

¿Cuál es la objeción?

LCDA. SHEILA TORRES DELGADO:

Prueba documental. Ha surgido... ha desfilado.

HONORABLE JUEZ:

Usted acaba de argumentar...

LCDA. SHEILA TORRES DELGADO:

Por eso. Él le está haciendo... ¿Podemos retirar al... para poder hacer la argumentación?

LCDA. SANDRA M. LUGO ANDÚJAR:

Estoy de pie por la espalda, no es que voy a postular.

HONORABLE JUEZ:

Está bien.

LCDA. SHEILA TORRES DELGADO:

Su Señoría, la pregunta es, la pregunta fue que no ha desfilado evidencia en este Tribunal. La pregunta es *misleading* porque ha desfilado evidencia testimonial. Si la pregunta es si ha desfilado prueba documental, entonces, eh...

Es por esto, que le hemos dado mayor credibilidad a la prueba oral desfilada en soporte al postulado del apelante, con relación al referido de Menonita. Veamos.

En el primer día de juicio, testificaron Del Valle Padilla y Prieto Batista.[54] Sus testimonios se corroboran mutuamente. Prieto Batista testificó que, al momento del Huracán María, se desempeñaba como Director de la Dirección Legal de Menonita.[55] Indicó que, como tal, sus funciones eran "asesorar al director y a la junta en todos aquellos asuntos legales que [le] solicitaban opiniones, […], recomendaciones, […], referir", etc.[56]

Testificó que, a consecución del Huracán María, el cuerpo ejecutivo que respondía directamente al director ejecutivo de Menonita se reunía diariamente.[57] En una de estas reuniones, dialogaron sobre la reclamación que le harían a su aseguradora.[58] Este le indicó al Foro Apelado que de esa reunión salió con la

---

[54] Transcripción de la prueba oral, págs. 1029-1139.
[55] *Id.*, pág. 1030.
[56] *Id.*, pág. 1030.
[57] *Id.*, pág. 1034.
[58] *Id.*, págs. 1036-1041.

encomienda específica, por parte del director y cuerpo ejecutivo, de conseguir un ajustador público que los asistiera en el trámite de la reclamación. Testificó que, como resultado, realizó las siguientes gestiones:[59]

P: ¿Y qué gestiones, si alguna, usted hizo?

R: Bueno, pues yo de inmediato llamé **al licenciado Jesús Del Valle Padilla**.

[...]

P: ¿Para qué?

R Bueno, **para que él me orientara**, porque yo verdaderamente de reclamaciones de daños de esa naturaleza, pues, no sabía.

P: ¿Y qué, si algo, sucede entonces?

R: Pues entonces ahí él me comentó de la firma Caribbean Adjusters Inc. Caribbean Adjusters Inc...

[...]

R: ...de Caribbean Adjusters Inc., de CAI. Yo no los conocía y entonces él me los refirió, y me los refirió y en una próxima reunión del grupo ese corporativo...

P: ¿De?

R De Menonita, a esa reunión que se celebraba periódicamente, por lo menos, tres o cuatro veces en la semana, pues ellos fueron allí, eh, **invitados por mí y por recomendación y referido del licenciado Del Valle.** En esa reunión llegó el señor Luis Esteves, acompañado de su señor padre, al que yo por otras razones había conocido anteriormente, y entonces hicieron una presentación de sus servicios al grupo de ejecutivos que estaba ahí. Yo recibí unas instrucciones del licenciado Pedro Luis Meléndez Rosario, de que hiciera los contactos pertinentes para la eventual contratación, se contrataron, eh, a dicha firma para la evaluación de los daños y también, eh, se nos... posteriormente se habló de las reclamaciones a FEMA, y el señor Esteves, como presidente de CAI, eh recomendó o nos refirió a una firma que, si mal no recuerdo el nombre, Tidal Basin, la cual también se contrató. Pero a partir de esa intervención mía todo lo relacionado con la reclamación, el ajuste de daños, lo de Tidal Basin, lo manejó por delegación del director ejecutivo, el director ejecutivo asociado, el señor Ricardo Hernández Rivera. El CPA Ricardo Hernández Rivera, y él continuó con toda esa tarea. Yo solamente, mi

---

[59] Transcripción de la prueba oral, págs. 1036-1041. (Énfasis suplido).

función posterior fue participar en unos tranques que hubo con la aseguradora Triple S, en reuniones. En una ocasión que me llevó a la oficina del Comisionado de Seguros el licenciado Del Valle, y en vistas que se celebraron a las cuales compareció el señor Luis Esteves por CAI, Mario Prieto y Ricardo Hernández por Menonita, y también compareció el licenciado Jesús Del Valle Padilla.

P: *Okey. Le pregunto si antes que el licenciado... ¿En qué momento, si alguno, antes de que el licenciado Del Valle le mencionara la asistencia de CAI, usted había oído de esa corporación, de ese negocio?*

R: *Nunca*.

[...]

P: Le pregunto, luego de esa conversación con Del Valle y la presentación de la compañía CAI, ¿hizo, o cuál, si alguna gestión, hizo el grupo Menonita para orientarse y/o contratar a otra compañía de ajustadores públicos?

R: Que yo sepa ninguno. Porque posteriormente todos los trabajos los siguió conduciendo conjuntamente con el señor Luis Esteves el señor CPA Ricardo Hernández Rivera, como director ejecutivo, que le había delegado esa función el director ejecutivo Pedro Luis Meléndez Rosario. Y de ahí solamente yo participaba cuando era necesario en asuntos de vistas ante la Oficina del Comisionado o cualquier asunto legal; pero de ahí en adelante yo no tuve ningún otro tipo de participación y no entiendo que se haya... De hecho, ellos fueron los que se contrataron.

P: Le pregunto, ¿por quién específicamente, si se puede mencionar un nombre, es que Menonita llega a CAI?

R: Bueno, *porque yo hice el acercamiento al licenciado Jesús Del Valle y él fue que me lo refirió. Y yo lo invité a él a la reunión, y de esa reunión se contrataron los servicios de ellos.*

En el contrainterrogatorio, CAI se limitó a establecer que Prieto Batista no era la persona que tomaba la decisión final de contratación, ni firmó en el contrato entre CAI y Menonita.[60] Sin embargo, nos rehusamos a darle peso a este hecho, por dos (2) razones. En primera instancia, surge del testimonio creído por el TPI-Bayamón, que Prieto Batista recibió la encomienda específica de

---

[60] Transcripción de la prueba oral, págs. 1043-1055.

buscar los servicios que eventualmente ofreció CAI, del director ejecutivo, sobre quien recaía la decisión final. Además, entendemos que los procesos internos de Menonita para buscar orientación y eventualmente contratar a CAI, no deben incidir en las comisiones de los vendedores de estos últimos. Es decir, entendemos que no es justo castigar a un vendedor – en este caso el apelante – que es contactado directamente por un cliente – en este caso Menonita – para una orientación, por el hecho de que el individuo que hace el enlace inicial no es el que toma la decisión final de contratar.

Luego de evaluar toda la prueba oral y documental que desfiló en juicio, el mismo Tribunal que *ahora revocamos*, reconoció en su "Sentencia" que el enlace entre Menonita y CAI se dio en virtud de la orientación que Prieto Batista recibió de Del Valle Padilla, en calidad de vendedor. Así lo consta en sus determinaciones de hechos, las cuales destacamos a continuación:[61]

> 51. Entre sus funciones como director de la división legal del sistema hospitalario se encontraba el asesorar al Director y a la Junta. También atendía las reclamaciones de daños.
>
> 52. El sistema de Salud Menonita se compone de múltiples localidades. Ubicadas en Guayama, Aibonito, Caguas, Cayey y Centros de Diagnósticos y tratamientos en Cidra, Aibonito, Aguas Buenas, Comerio, Barranquitas, Morovis, Yabucoa y Culebra.
>
> 53. El Huracán María afecto las instalaciones del sistema de Salud Menonita.
>
> 54. ***Por los daños sufridos en sus instalaciones se comunicó con el demandante para que le orientara sobre el proceso de reclamaciones.***
>
> 55. Lo llamó por la confianza que le tiene y por su conocimiento en la industria de seguros.
>
> 56. ***Fue el demandante quien le habló sobre los servicios que ofrecía CAI.***
>
> 57. El Lcdo. Prieto no conocía otra persona en CAI, ni había tenido relaciones previas con ellos.

---

[61] Apéndice del recurso, pág. 934. (Énfasis suplido).

58. ***El Lcdo. Prieto recomendó que contrataran a CAI por la explicación y presentación que le hizo el demandante de servicios de CAI.***

Sin embargo, determinó que el apelante "no fue quien orientó sobre los servicios de CAI a la persona a cargo de decidir si contrataba o no los servicios", puesto que en la reunión entre CAI y Menonita en donde se acordó firmar el contrato, Del Valle Padilla no se encontraba ni habló directamente con el director ejecutivo de Menonita.[62] Por lo tanto, concluyó que "[n]o fue el trabajo del demandante lo que incidió esa contratación".[63] Justipreciamos que el Foro Primario se equivocó.

Este Tribunal concluye que los requisitos para materializar el referido directo de un vendedor a CAI se concretan en el caso del apelante y Menonita. Surge de la prueba no controvertida en el juicio, y establecida mediante las determinaciones de hechos del Foro Apelado, *que el contacto entre Menonita y CAI ocurrió por medio de Del Valle Padilla.* Prieto Batista, encomendado por Menonita y su director ejecutivo, se comunicó directamente con este para recibir una orientación de los servicios de CAI. Esta orientación movió a la persona designada de conseguir un ajustador público – Prieto Batista – a recomendar los servicios de CAI. Esto, a su vez, redundó en la comunicación entre ambas partes y la posterior contratación.

Del Valle Padilla no tenía que realizar trámites adicionales, ni comparecer a las reuniones ni firmar el contrato para cumplir con sus funciones como vendedor de CAI.

En el *segundo y tercer señalamiento de error*, el apelante arguye que el Foro Primario se equivocó al no imponer honorarios e intereses legales a la apelada por temeridad. Por su estrecho vínculo

---

[62] Apéndice del recurso, pág. 935.
[63] *Id.*

entre sí, discutiremos estos errores en conjunto. *No le asiste la razón.*

La determinación de temeridad es un asunto altamente discrecional del Foro Primario. Dentro del criterio de razonabilidad que impera en nuestra función revisora, estamos llamados a evaluar este tipo de señalamientos de error con gran deferencia. La misma solo será objeto de revisión si ha mediado abuso de discreción en el ejercicio de su ministerio.

Como esbozáramos previamente, la imposición de honorarios e intereses debe responder a la conducta temeraria de la parte perdidosa. Luego de evaluar la prueba documental y oral que obra en autos, los alegatos de las partes, los argumentos de hecho y en derecho en los que se amparó la apelada, concluimos que su proceder no fue uno imprudente o irreflexivo.

**IV.**

Por los fundamentos que anteceden, revocamos la *"Sentencia"* apelada, a los fines de ordenarle a CAI el pago a Del Valle Padilla la comisión del veinte por ciento (20%) de Menonita. Por todo lo demás, sostenemos el dictamen del TPI-Bayamón.

Lo acordó y manda el Tribunal, y certifica la Secretaria del Tribunal de Apelaciones.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones